IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AURORA MILITARY HOUSING,     )
LLC, et al.,     )
     )
     Plaintiffs,     )     No. 21-2182
     )     (Senior Judge Horn)
v.     )
     )
THE UNITED STATES,     )
     )
     Defendant.     )

## **DEFENDANT'S MOTION TO DISMISS**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Elizabeth M. Hosford
ELIZABETH M. HOSFORD
Assistant Director

OF COUNSEL:

ALISSA SCHRIDER
Trial Attorney
Air Force Legal Operations Agency
1500 W. Perimeter Rd.
Joint Base Andrews, MD 20762

/s/ Ebonie I. Branch
EBONIE I. BRANCH
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 353-7578
Facsimile: (202) 305-7644

February 25, 2022     Attorneys for Defendant

**<u>TABLE OF CONTENTS</u>**

INTRODUCTION ............................................................................................. 1

STATEMENT OF THE ISSUE ....................................................................... 3

STATEMENT OF FACTS................................................................................ 3

     I.      The Military Housing Privatization Initiative And The Lease Agreements .......... 3

     II.     The BAH Statute And NDAA Payments.......................................................... 9

     III.    Aurora's Claim And Denial ............................................................................ 11

SUMMARY OF THE ARGUMENT............................................................... 12

ARGUMENT ..................................................................................................13

     I.      Standard Of Review ...................................................................................... 13

     II.     Aurora Cannot Establish Any Contractual Duty Or Obligation InThe Lease Agreement To Support Its Breach Of Contract Claim Because The United States Is Not Responsible For Paying Tenant Rent And Aurora Agreed To Cap Tenant Rent To The BAH Actually Received By Service Members............................. 14

          A.  In The Lease Agreement The Government Expressly Disclaimed Any Duty Or Obligation To Pay Tenant Rent, And Tenant Rent Is Capped At Each Service Members' BAH ............................................................................15

          B.  Aurora Improperly Attempts To Read-In A New Lease Term Regarding The Method To Calculate BAH That Was Never Incorporated Into The Lease Agreements .................................................................................................21

     III.    Aurora Cannot Establish A Breach Of The Implied Duty Of Good Faith And Fair Dealing By Expanding Non-Existent Duties.....................................................25

     IV.    Aurora Cannot Establish A Fifth Amendment Taking Because It Agreed To All The Requirements In The Lease Agreement That Form The Basis Of Its Claim.…………………………………………………………………….26

CONCLUSION..............................................................................................28

**TABLE OF AUTHORITIES**

Cases                                                              Page(s)

*1st Home Liquidating Tr. v. United States,*
    581 F.3d 1350 (Fed. Cir. 2009)........................................................14

*A&D Auto Sales, Inc. v. United States,*
    748 F.3d 1142 (Fed. Cir. 2014)........................................................27

*Acceptance Insurance Cos., Inc. v. United States,*
    583 F.3d 849 (Fed. Cir. 2009)........................................................26

*Allegre Villa v. United States,*
    60 Fed. Cl. 11 (2004) ........................................................27

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)........................................................13, 14, 18

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ........................................................14, 18

*Bell/Heery v. United States,*
    739 F.3d 1324 (Fed. Cir. 2014)........................................................15, 25

*Bowers Inv. Co., LLC v. United States,*
    104 Fed. Cl. 246 (2011)........................................................ 4

*Centex Corp. v. United States,*
    395 F.3d 1283 (Fed. Cir. 2005)........................................................25

*Century Expl. New Orleans, Inc. v. United States,*
    110 Fed. Cl. 148 (2013)........................................................28

*Cienega Gardens v. United States,*
    331 F.3d 1319 (Fed. Cir. 2003)........................................................27

*Grayton v. United States,*
    92 Fed. Cl. 327 (2010) ........................................................13

*Hamlet v. United States,*
    873 F.2d 1414 (Fed. Cir. 1989)........................................................13

*Lindsay v. United States,*
    295 F.3d 1252 (Fed. Cir. 2002)........................................................13

*Link v. Department of the Treasury,*
  51 F.3d 1577 (Fed. Cir. 1995). ........................................................................14

*Lynch v. United States,*
  292 U.S. 571 (1934) .......................................................................................27

*Metcalf Const. Co. v. United States,*
  742 F.3d 984 (Fed. Cir. 2014). .......................................................................25

*Northrop Grumman Info. Tech., Inc. v. United States,*
  535 F.3d 1339 (Fed. Cir. 2008). ...............................................................23, 24

*NVT Techs., Inc. v. United States,*
  370 F.3d 1153 (Fed. Cir. 2004)................................................................15, 24

*Precision Pine & Timber, Inc.,*
  596 F.3d 817 (Fed. Cir. 2010)………………………………………………...23, 25, 26

*Piszel v. United States,*
  833 F.3d 1366 (Fed. Cir. 2016)..................................................................…...27

*Proxtronics Dosimetry, LLC v. United States,*
  128 Fed. Cl. 656 (2016) ....................................................................................4

*S. Cal. Edison v. United States,*
  58 Fed. Cl. 313 (2003) ....................................................................................15

*San Carlos Irrigation & Drainage Dist. v. United States,*
  877 F.2d 957 (Fed. Cir. 1989). .......................................................................14

*Smithson v. United States,*
  847 F.2d 791 (Fed. Cir. 1988). .......................................................................23

*St. Christopher Assocs., L.P. v. United States,*
  511 F.3d 1376 (Fed. Cir. 2008)...................................................................23, 27

*Sun Oil Co. v. United States,*
  215 Ct. Cl. 716, 572 F.2d 786 (1978) .............................................................27

*Texas v. United States,*
  537 F.2d 466 (Ct. Cl. 1976) ............................................................................23

*United Communities, LLC v. United States,*
  154 Fed. Cl. 676 (2021) .................................................................16, 17, 24, 26

**Statutes**

10 U.S.C. §§ 2871-2885 ................................................................................................................3

37 U.S.C. § 403 ................................................................................................................passim

Pub. L 114-92 ................................................................................................................10

Pub. L. 115-91. ................................................................................................................11

Pub. L. 115-232. ................................................................................................................11

Pub. L. No. 104-106 ................................................................................................................3

Pub. L. No. 116-92 ................................................................................................................11

**Rules**

RCFC 8 ................................................................................................................13

RCFC 8(a)(2) ................................................................................................................13

RCFC 12(b)(6) ................................................................................................................13

**Other Authorities**

GAO-18-218 ................................................................................................................20

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AURORA MILITARY HOUSING, LLC, et al., | ) ) ) | |
| Plaintiffs, | ) ) | No. 21-2182 (Senior Judge Horn) |
| v. | ) ) | |
| THE UNITED STATES, | ) ) | |
| Defendant. | ) ) | |

## DEFENDANT'S MOTION TO DISMISS

Pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC), defendant, the United States, respectfully requests that the Court dismiss the complaint of plaintiffs Aurora Military Housing, LLC (Aurora I), Aurora Military Housing II, LLC (Aurora II), and Aurora Military Housing III, LLC (Aurora III) (collectively, Aurora) for failure to state a claim upon which relief can be granted. In support of this motion, we rely upon the complaint, our attached appendix of exhibits, and the following brief.

## INTRODUCTION

This case arises out of the Military Housing Privatization Initiative (MHPI), a Department of Defense (DoD) program that grants the military departments the authority to convey and lease property and facilities to private entities who are then responsible for providing and maintaining military housing for the benefit of service members and their families. Under the MHPI, Aurora and the Air Force, also acting on behalf of the Army, entered into three Lease Agreements governing three phases of the construction and renovation of property located on what is now known as Joint Base Elmendorf-Richardson (JBER) in Anchorage, Alaska. Those Lease Agreements include: Aurora I, entered into on March 14–15, 2001, and amended December 13, 2005 (Aurora I Amended Lease); Aurora II, entered into on September 30, 2004,

1

and amended December 13, 2005 (Aurora II Amended Lease); and Aurora III, entered into on June 30, 2011 (Aurora III Lease) (collectively, Lease Agreements). Generally, the Air Force leased its then existing inventory of military family housing and the land upon which that housing was located to Aurora. In turn, Aurora is now responsible for, among other things, the ownership, operation, and maintenance of on-base rental housing.

Pursuant to the Lease Agreements, Aurora earns revenues on its projects through tenant rent paid primarily by service members directly to Aurora. Service members' rent is based on their Basic Allowance for Housing (BAH), which is a United States based allowance prescribed by geographic duty location, pay grade, and dependency status. Aurora raises three counts in its complaint, all of which are based on statutory changes in how service members' BAH is calculated under 37 U.S.C. § 403. Primarily, Aurora claims that the statutory changes affected its expectation interest in the Lease Agreements, and thus constitutes a breach of contract.

However, the Lease Agreements' plain language make clear that the Government is not responsible for making tenant rent payments to Aurora, and that Aurora agreed to cap the tenant rent it can charge service members based on their actual BAH. The Lease Agreements also do not guarantee occupancy of the housing units, and recognize that tenant rent fluctuates annually and based on each tenant's pay grade. Nonetheless, Aurora now attempts to read in a new contract term regarding the method of calculating BAH. In reality, however, Aurora got exactly what it bargained for.

In exchange for obtaining a 50-year lease of Government property for a one-dollar nominal fee, Aurora also agreed to operate and manage housing for service members, subject to the Lease Agreements' numerous terms and conditions—terms specifically designed to protect service members and the Government from the claims being advanced here. Accordingly, the

2

Court should dismiss the complaint for failure to state a claim upon which relief can be granted.

STATEMENT OF THE ISSUE

Whether Aurora can establish entitlement to higher military housing tenant rent under its Lease Agreements with the Air Force when the Government is expressly not liable for any payments to Aurora, and when the Lease Agreements capped monthly tenant rent to the BAH actually received by each service member.

STATEMENT OF FACTS

I.  The Military Housing Privatization Initiative And The Lease Agreements

Congress established the MHPI in 1996 by granting DoD authority to work with the private sector to build, renovate, and maintain military housing. National Defense Authorization Act for Fiscal Year 1996, Pub. L. No. 104-106, § 2801, 110 Stat 186, codified at 10 U.S.C. §§ 2871-2885. The MHPI was designed to help the military enhance service members' quality of life by improving their housing conditions with the support of private sector financing, expertise, and innovation. *See* Office of the Assistant Secretary of Defense for Sustainment, Facilities Management – Military Housing Privatization Initiative, https://www.acq.osd.mil/eie/ FIM/Housing/Housing_index.html (last visited Feb. 11, 2022). The MHPI also allowed the military to provide necessary housing faster and more efficiently than traditional military construction processes. *See id*.

More specifically, the MHPI was designed to address two significant problems concerning housing for service members and their families: (1) the poor condition of DoD owned housing; and (2) a shortage of quality, affordable, private housing. *Id*. The Office of the Secretary of Defense delegated authority to each military branch to enter into agreements with private developers to own, maintain, and operate family housing via a 50-year lease. *Id*.

3

As part of the MHPI, Aurora and the Air Force, also acting on behalf of the Army, entered into the Lease Agreements, coinciding with three construction and renovation phases at Elmendorf Air Force Base (Elmendorf)/JBER.  The Government and Aurora I executed the first agreement on March 14, 2001, and March 15, 2001, with the goal of privatizing 828 military family housing units at Elmendorf.[1]  Compl. ¶¶ 23, 30; Aurora I Amended Lease at 1 (Defendant's Appendix).[2]  The 50-year agreement is effective from March 16, 2001, to March 31, 2051.  Aurora I Amended Lease ¶ 1.1.  The Government and Aurora II entered the second agreement on September 30, 2004, with the goal of privatizing 1,194 military family housing units at Elmendorf.  Compl. ¶¶ 37, 44; Aurora II Amended Lease at 1.  The 50-year agreement is effective from October 1, 2004, to September 30, 2054.[3]  Aurora II Amended Lease ¶¶ 1.1–1.3.  The Government and Aurora III executed the third agreement on June 30, 2011, with the goal of privatizing over 1,000 military family housing units at what is now JBER.  Compl. ¶¶ 52, 59; Aurora III Lease at 1.  The 50-year agreement is effective from July 1, 2011, to June 30, 2061.  Aurora III Lease ¶ 1.1.

Under the Lease Agreements, the Air Force has leased land located at JBER to Aurora and also transferred ownership interest in housing units for purposes of demolition, design, construction, renovation, and operation and maintenance of rental housing.  Compl. ¶¶ 24, 45,

---

[1] The factual allegations recited herein from the complaint are taken as true for purposes of this motion to dismiss only.  Should the Court deny this motion, we reserve the right to contest every factual allegation in the complaint.

[2] It is well established that when considering whether to dismiss an action for failure to state a claim, "courts may look outside the complaint and 'consider matters incorporated by reference or integral to the claim.'" *Bowers Inv. Co., LLC v. United States,* 104 Fed. Cl. 246, 258 (2011), *aff'd,* 695 F.3d 1380 (Fed. Cir. 2012); *Proxtronics Dosimetry, LLC v. United States,* 128 Fed. Cl. 656, 662 n.1 (2016).  Here, the attached Lease Agreements and incorporated Operating Agreement are central to Auroras' claims and resolving the legal issue.  We can provide complete versions of these documents at the Court's request.

[3] On December 13, 2005, the Aurora I and Aurora II agreements were amended, allowing Aurora to refinance existing debt.  Compl. ¶¶ 49–51.

60.  Aurora paid the Government a one-dollar nominal fee for each 50-year lease.  Aurora I Amended Lease ¶ 4.1; Aurora II Amended Lease ¶ 4.1; Aurora III Lease ¶ 4.1.

The Lease Agreements incorporate an "Operating Agreement," which identifies "detailed procedures and requirements" Aurora must follow in constructing, renovating, operating, and maintaining the leased premises.  Aurora I Amended Lease ¶ 5.1; Aurora II Amended Lease ¶ 5.1; Aurora III Lease ¶ 5.1.  Aurora must also operate the project in accordance with several different plans included as attachments to the Operating Agreement, several of which are pertinent to the claims here.  Aurora I Amended Lease ¶ 5.2; Aurora II Amended Lease ¶ 5.2; Aurora III Lease ¶ 5.2.

The Lease Agreements make clear that service members and key and essential personnel, and their families, referred to as "Referral Tenants" or "Target Tenants," are the intended tenants of the housing units, and their housing leases shall be in accordance with the Operating Agreement's Unit Occupancy Plan and the Rental Rate Management Plan.  *See, e.g.*, Aurora I Amended Lease ¶ 19.5 (defining "Referral Tenant[s]"); Aurora III Lease ¶ 34.2 (defining "Target Tenant[s]").[4]  However, the Lease Agreements also state that the Government does not guarantee occupancy of privatized housing by service members or anyone else. Specifically, the Aurora I and Aurora II Amended Leases state that "the Government is not guaranteeing the occupancy of any Housing Units" or "requir[ing] military personnel and dependents stationed at Elmendorf AFB or elsewhere to rent Housing Units," as "[m]ilitary

---

[4] Aurora may also offer housing to "Other Eligible Tenants" when vacancy rates fall below 95 percent. This means any tenant other than a Referral or Target Tenant, which includes other active duty service members, National Guard and Reserve members, Federal Civil Service employees, and more.  *See,* e.g., Aurora II Unit Occupancy Plan at 6; Aurora III Unit Occupancy Plan at 3–4.  The specified vacancy rate has been updated since to 98 percent.  *See* Air Force Instruction 32-6000, Civil Engineering, Housing Management, ¶ 6.12.2 (Mar. 18, 2020), *available at* https://static.e-publishing.af.mil/production/1/af_a4/publication/afi32-6000/afi32-6000.pdf (last visited Feb. 14, 2022).

5

personnel are free to go elsewhere if they choose to do so." Aurora I Amended Lease ¶ 19.4;

Aurora II Amended Lease ¶ 19.4. Relatedly, the Aurora III Lease states that "[Aurora]

acknowledges and agrees" that service members "do not have an obligation to reside in

privatized housing," that "the Government does not require or guarantee occupancy of privatized

housing" by service members, and that "the Government does not guarantee occupancy of the

units." Aurora III Lease ¶ 19.4.

Aurora must operate and maintain the rental housing development on JBER *"at its sole*

*cost and expense.*" Aurora I Amended Lease ¶ 19.3; Aurora II Amended Lease ¶ 19.3; Aurora

III Lease ¶ 19.3 (emphasis added). Likewise, per the Operating Agreements, Aurora "shall

operate and maintain [the housing] *at no expense to the Government.*" Aurora I Operating

Agreement ¶ 2(b); Aurora II Operating Agreement ¶ 2(b) (emphasis added). Instead, Aurora

"shall collect from tenants all rents, damage deposits, and other fees that are permissible under

the Lease." *Id*. "The Government shall have *no liability for costs* associated with the operation

and maintenance of the [housing], or for any tenant defaults." *Id*. (emphasis added).

With respect to the housing landlord-tenant leases between Aurora and service members,

Aurora agreed to cap the amount of rent it can charge service members to lease the housing units

based on each service member's BAH. Compl. ¶¶ 25, 39, 53. This is known as "Referral Rent"

under the Aurora I and Aurora II Amended Leases, which means:

> with respect to a Referral Tenant an amount equal to (i) the
> tenant's monthly BAH, at the with dependent rate (provided
> however, that if two military members reside in the same housing
> unit, the 'with dependent' BAH for the highest ranking members
> shall be used, and further provided that the 'without dependent'
> rate shall be used for certain unaccompanied key and essential
> members as provided in the Rental Rate Management Plan) less
> (ii) the then applicable Estimated Utility Costs for such Housing
> Unit; provided, however, that there shall be no deduction of
> Estimated Utility Costs from the rents charged to Referral Tenants

> until the first day of the first month immediately following the
> Completion Date. It is understood and agreed that the Lessee shall
> be responsible for payment of all Utility Costs relating to all
> Housing Units in the Project prior to the Completion Date and
> following the Completion Date for all Housing Units to the extent
> not separately metered.

Aurora I Amended Lease ¶ 19.5; Aurora II Amended Lease ¶ 19.5 (emphasis in original).

Similarly, the Aurora III Lease defines "Target Rent" as:

> (a) with respect to each Target Tenant who is an active duty
> member of the Uniformed Services, such tenant's monthly BAH at
> the 'with depend[e]nt' rate less an amount sufficient to cover 110%
> of the average utility cost if such deduction is required pursuant to
> the Operating Agreement; and (b) with respect to each Target
> Tenant who has been designated by the Government as 'Key and
> Essential,' and is either single or unaccompanied, an amount equal
> to the BAH at the 'without dependent' rate for the Tenant's pay
> grade less an amount sufficient to cover 110% of the average
> utility cost if such deduction is required pursuant to the Operating
> Agreement.

Aurora III Lease ¶ 34.11. In turn, the Aurora I and Aurora II Amended Leases define BAH as

"the sum allotted to each service member to cover the cost of housing, including utilities and

personal property insurance. The respective amount corresponds with the service member's rank

and dependent status. Refer to Internet web site http://www.dtic.mil/perdiem/bah.html for

additional information." Aurora I Amended Lease ¶ 19.5; Aurora II Amended Lease ¶ 19.5.

The Aurora III Lease, at paragraph 34.2, has a similar BAH definition:

> [W]ith respect to an active duty member of the Uniformed
> Services, the entitlement of such member for the cost of housing,
> including utilities and personal property insurance, pursuant to 37
> U.S.C. Chapter 7, Section 403. Such amount corresponds to such
> service member's Pay Grade and dependent status. These values
> are set annually by the Department of Defense and published on
> the website www.dtic.mil.[5]

---

[5] Although the Lease Agreements reference the www.dtic.mil website, the BAH rates are currently published by the Defense Travel Management Office, *available at* https://www.defensetravel.dod.mil/site/bah.cfm.

The Lease Agreements notify Aurora that the DoD modifies BAH annually. Notably, the BAH definition in the Aurora III Lease includes this notice. *See id*. The Rental Rate Management Plan, incorporated in the Aurora I and Aurora II Amended Leases, likewise explains the annual changes in BAH, in addition to identifying other impacts on housing unit rent that coincide with changes affecting service members:

> Rental Rates for the subject properties will change as BAH changes or as promotions or demotions occur. The website at www.dtic.mil/perdiem/bah.html is monitored for changes in the BAH rates. The rental rate is immediately modified to reflect changes in the BAH information. Rental rates for individual units also change based on promotions/demotions of the residents. The HMO provides a monthly list of promotes/demotes. Again, rental rates are updated immediately upon receipt of new information and lease files are revised to reflect the new information.

Aurora II Rental Rate Management Plan at 3; *see also* Aurora I Rental Rate Management Plan at 1 (also stating that "[r]ental rates for the subject properties will change as BAH changes" and based upon "promotions/demotions of tenants"). The rental plans reiterate that "[c]hanges in individual unit rents" are "based on BAH and tenant rank changes" and are adjusted regularly. Aurora I Rental Rate Management Plan at 1; Aurora II Rental Rate Management Plan at 3.

The Lease Agreements also include a Government-approved Military Resident Lease for tenants who are active duty service members, and each tenant is required to sign a tenant lease prior to occupancy. Aurora I Amended Lease, ¶ 19.6; Aurora II Amended Lease ¶ 19.6; Aurora III Lease ¶ 19.6. The approved Military Resident Lease mirrors Referral and Target Rent provisions in the Lease Agreements and Operating Agreement regarding the amount of rent Aurora can charge. Specifically, the Military Resident Lease provides that each "[t]enant agrees to pay as rent an amount *equal to* the ranking military member of the household's Basic Allowance for Housing at the dependents rate (BAH). Rent shall be paid by allotment." Aurora

I Military Resident Lease at 2; Aurora II Military Resident Lease at 2; Aurora III Military Resident Lease at 2 (emphasis added). The resident leases require, among other things, that tenants "execute a Special Power of Attorney allowing [Aurora] to initiate and modify allotments to comply with provisions of [the] [a]greement," to include the power to "[m]odify the allotment to reflect *annual changes* in BAH rates." *Id*. (emphasis added).

II.   The BAH Statute And NDAA Payments

Although the Lease Agreements provide a general background definition of BAH, 37 U.S.C. § 403 sets forth specific details on different categories of BAH, which are generally based on geographic duty location, pay grade, and dependency status. Section 403 also sets forth the method by which BAH will be calculated. From October 2000 to 2014, the BAH statute generally required the Secretary of Defense to determine the costs of adequate housing in a military housing area for all members of the uniformed services based on "the costs of adequate housing for civilians with comparable income levels in the same area" and historical data regarding the national average monthly housing costs for the two preceding years. *See* 37 U.S.C § 403 (2000-2014).

In the 2015 National Defense Authorization Act (NDAA), Congress amended the BAH statute, authorizing the Secretary of Defense to implement a percentage-based reduction of BAH not to exceed one percent. 37 U.S.C. § 403 (Dec. 14, 2014–Nov. 24, 2015); Joint Explanatory Statement To Accompany The National Defense Authorization Act For Fiscal Year 2015, Modification Of Computation Of Basic Allowance For Housing Inside The United States (sec. 604), at 86–87, *available at* https://www.armed-services.senate.gov/imo/media/doc/113-S1847-JES.pdf (noting DoD proposed changes to BAH and budgetary concerns to maintain Armed Forces readiness). Pursuant to the exercise of that discretion, beginning in FY 2015, the BAH

was determined for any given area of the country based on the costs of adequate housing for civilians with comparable income levels in the same area with a reduction, not to exceed one percent, based on national average monthly cost of adequate housing. In FY 2016, the BAH statute was again amended to allow for percentage-based reductions over the next several years. *See* National Defense Authorization Act For Fiscal Year 2016, Pub. L. 114-92, § 603, Nov. 25, 2015, 129 Stat 726 (NDAA 2016). Thus, since 2016, in its current and relevant form, the BAH statute states:

> (A) The monthly amount of the basic allowance for housing for an area of the United States for a member of a uniformed service shall be the amount equal to the difference between-
>> (i) The amount of the monthly cost of adequate housing in that area, as determined by the Secretary of Defense, for members of the uniformed services serving in the same paygrade and with the same dependency status as the member, and
>> (ii) The amount equal to a specified percentage (determined under subparagraph (B)) of the national average monthly cost of adequate housing in the United States, as determined by the Secretary, for members of the uniformed services serving in the same pay grade and same dependency status as the member.
> (B) The percentage to be used for purposes of subparagraph (A)(ii) shall be determined by the Secretary of Defense and may not exceed the following:
>> (i) One percent for months occurring during 2015.
>> (ii) Two percent for months occurring during 2016.
>> (iii) Three percent for months occurring during 2017.
>> (iv) Four percent for months occurring during 2018.
>> (v) Five percent for months occurring after 2018.

37 U.S.C. § 403(b)(3).

Relatedly, in 2018, Congress directed the Secretary of Defense to make payments to lessors of "covered housing," which generally includes MHPI projects such as Aurora, of one percent of the amount calculated under 37 U.S.C. § 403(b)(3)(A)(i) for the area in which the covered housing exists. National Defense Authorization Act for Fiscal Year 2018, Pub. L. 115-

10

91, § 603, Dec. 12, 2017, 131 Stat 1283 (NDAA 2018). The following year, Congress directed the Secretary to make payments to lessors of five percent as calculated under 37 U.S.C. § 403(b)(3)(A)(i). *See* National Defense Authorization Act for Fiscal Year 2019, Pub. L. 115-232, § 606, Aug. 13, 2018, 132 Stat 1636 (NDAA 2019). In essence, qualifying MHPI projects are paid a percentage of average local housing costs, as determined under 37 U.S.C. § 403(b)(3)(A)(i), without the percentage-based reduction of national average costs determined under subsection 403(b)(3)(A)(ii). In contrast, service members are paid BAH at rates using the complete formula under section 403(b)(3), *i.e.* the net result after applying the percentage-based reduction of national average costs. This means that high cost of housing areas that exceed national average costs receive larger NDAA payments compared to the national average reductions calculated in BAH rates paid to service members in that area.

Most recently, the Secretary was directed to make 2.5 percent payments to qualifying privatized housing projects using a slightly modified formula, and to make additional payments to lessors who are responsible for underfunded MHPI projects. *See* National Defense Authorization Act For Fiscal Year 2020, Pub. L. No. 116-92, § 3036, Dec. 20, 2019, 133 Stat 1198 (NDAA 2020).

III.   Aurora's Claim And Denial

On December 14, 2020, Aurora submitted three certified claims to the Air Force, totaling $5,239,754. Compl. ¶ 5; Compl. Ex. 1 [Certified Claim] at 1, ECF No. 1-1. Therein, Aurora argued that the change in statutory method to calculate BAH violated the Lease Agreements, and thus constituted a breach of contract, breach of the implied duty of good faith and fair dealing, and a taking without just compensation under the Fifth Amendment.

On April 7, 2021, the Air Force denied all three claims, concluding that Aurora failed to

"establish any contractual duty or obligation in the lease agreement to support its breach of contract claim because the Government is not responsible for paying tenant rent and Aurora agreed to cap the tenant rent to no more than the BAH." Compl. Ex. 2 [Final Decision] at 4, ECF No. 1-2. The Air Force also concluded that Aurora's claim for breach of the duty of good faith and fair dealing failed because it was not "connected to a duty clearly imposed by the contract itself." *Id*. In rejecting Aurora's Fifth Amendment taking claim, the Air Force found that Aurora "agreed to all the requirements in the lease agreement that form the basis of its claim." *Id*.

On November 18, 2021, Aurora filed its complaint in this Court, alleging: (1) breach of contract; (2) breach of the implied duty of good faith and fair dealing; and (3) a Fifth Amendment taking. Compl. ¶¶ 87–108. Aurora claims damages no less than $4,121,336. *Id*. ¶¶ 95, 101, 108.

## SUMMARY OF THE ARGUMENT

The Court should dismiss Aurora's complaint because it cannot establish any entitlement to higher tenant rent in the Lease Agreements as a matter of law. By the Lease Agreements' plain language, Aurora agreed to cap tenant rent to the BAH rates actually received by service members, and those BAH rates were to be unilaterally determined annually by DoD. The Government also expressly disclaimed any responsibility to pay tenant rent—rather, Aurora is required to operate and maintain housing at "its sole cost and expense." Aurora ignores the Lease Agreements' plain language and attempts to incorporate a new lease term regarding the method to calculate BAH by arguing that the BAH payments should be "based on the full fair market value of equivalent housing in the Anchorage area." *See* Compl. ¶ 75.

Moreover, Aurora cannot establish entitlement to higher tenant rent because the Lease

12

Agreements do not actually guarantee occupancy of the housing units, do not require the Government to pay tenant rent to Aurora, and informed Aurora that tenant rent fluctuates annually and based on each tenant's pay grade. At bottom, the Lease Agreements' cap on tenant rent was designed to protect service members who live on base from paying more for housing—not to enrich Aurora through direct payments from the Government.

Because no contractual duty or obligation exists for the Government to pay Aurora anything, Aurora cannot, as a matter of law, establish any breach of contract in count one or breach of the implied duty of good faith and fair dealing in count two. Likewise, based on resolution of the same contractual issue, it cannot establish a Fifth Amendment taking under count three.

<u>ARGUMENT</u>

I.   <u>Standard Of Review</u>

In considering a motion to dismiss, the Court must accept as true the complaint's undisputed allegations of fact and construe the facts in the light most favorable to the plaintiff. *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed. Cir. 1989); *Grayton v. United States*, 92 Fed. Cl. 327, 331 (2010). A motion to dismiss pursuant to RCFC 12(b)(6) will be granted if the facts asserted in the complaint do not entitle the plaintiff to a legal remedy. *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). The complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2). The pleading standard set forth in RCFC 8 does not require "detailed factual allegations," but does demand more than "unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Labels, conclusions, and conclusory allegations are not entitled to the assumption of truth. *See id.* at 680; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Relatedly, the court is not obligated to accept legal conclusions as true, or a legal conclusion couched as a factual allegation. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

II.  **Aurora Cannot Establish Any Contractual Duty Or Obligation In The Lease Agreement To Support Its Breach Of Contract Claim Because The United States Is Not Responsible For Paying Tenant Rent And Aurora Agreed To Cap Tenant Rent To The BAH Actually Received By Service Members**

As a preliminary matter, although Aurora raises three claims in its complaint, they all revolve around the same question of contract interpretation—whether the Lease Agreements create any entitlement for Aurora to receive BAH allotments in the form of tenant rent equivalent to the full fair market value of comparable housing in the Anchorage area. *See, e.g.*, Compl. ¶¶ 12, 14. As set forth below, the United States does not possess a contractual duty or obligation to pay Aurora any tenant rent under complaint count one, and thus there can be no breach of contract. And if no duty exists, then Aurora cannot create new duties under the guise of a breach of the implied duty of good faith and fair dealing in count two. For these same reasons, no contractual property interest exists for higher tenant rent to support a taking under the Fifth Amendment in count three.

To establish breach of contract, the complainant must show the existence of a contract, an obligation or duty arising out of that contract, a breach of the duty, and damages caused by the breach. *San Carlos Irrigation & Drainage Dist. v. United States,* 877 F.2d 957, 959 (Fed. Cir. 1989). A contract is breached if one of the parties fails to comply with a provision of the contract in a way that is material. *Link v. Dep't of the Treasury,* 51 F.3d 1577, 1582 (Fed. Cir. 1995).

"Contract interpretation is a question of law." *1st Home Liquidating Tr. v. United States,* 581 F.3d 1350, 1355 (Fed. Cir. 2009). Accordingly, in resolving a motion to dismiss, "the court must interpret the contract's provisions to ascertain whether the facts plaintiff alleges would, if

14

true, establish a breach of contract." *Bell/Heery v. United States*, 739 F.3d 1324, 1330 (Fed. Cir. 2014) (citing *S. Cal. Edison v. United States*, 58 Fed. Cl. 313, 321 (2003)) ("Contract interpretation is a matter of law and thus may be addressed by the Court in resolving a motion to dismiss.").

"Contract interpretation begins with the language of the written agreement," and "if the provisions are clear and unambiguous, they must be given their plain and ordinary meaning." *Bell/Heery*, 739 F.3d at 1330–31 (internal citations omitted). "[T]he document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts." *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004). "An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous." *Id.*

A.      In The Lease Agreements The Government Expressly Disclaimed Any Duty Or Obligation To Pay Tenant Rent, And Tenant Rent Is Capped At Each Service Member's BAH

In its complaint, Aurora admits that it must cap the amount of rent that it can charge service members for housing at an amount equal to each service member's BAH, and that this is a material term of the Lease Agreement. Compl. ¶¶ 25, 39, 51, 53. It then alleges that the "Government's unilateral decision to reduce the BAH to less than the fair market value of housing in the Anchorage area" constitutes a material breach of contract. *Id.* ¶ 94. Aurora focuses on the resulting impact on BAH rates after Congress amended 37 U.S.C. § 403, essentially arguing that the changes reduced its expectation interest under the Lease Agreements. *See generally* Compl. Thus, while admitting that it cannot charge service members more than they receive in BAH, Aurora inexplicably claims that the United States is now liable to pay for higher tenant rents based upon the fair market value of comparable Anchorage housing,

irrespective of the BAH actually received by service members.

To begin, the Lease Agreements repeatedly state that the Government is not responsible for paying Aurora anything. *See* Aurora I Amended Lease ¶ 19.3, Aurora II Amended Lease ¶ 19.3, Aurora III Lease ¶ 19.3 (Aurora must operate and maintain the rental housing development on JBER "at its sole cost and expense."). Likewise, in the incorporated Operating Agreement, Aurora "shall operate and maintain the [rental housing development] at no expense to the Government." Aurora I Operating Agreement ¶ 2(b); Aurora II Operating Agreement ¶ 2(b). "The Government shall have no liability for costs associated with the operation and maintenance of the [housing], or for any tenant defaults." *Id.*

Other provisions further support the lack of Government obligations in the Lease Agreements. Notably, the Aurora I and Aurora II Amended Leases state that "the Government is not guaranteeing the occupancy of any Housing Units" or "requir[ing] military personnel and dependents stationed at Elmendorf AFB or elsewhere to rent Housing Units." Aurora I Amended Lease ¶ 19.4; Aurora II Amended Lease ¶ 19.4. The Aurora III Lease contains a similar provision, which provides: "[Aurora] acknowledges and agrees" that service members "do not have an obligation to reside in privatized housing," that "the Government does not require or guarantee occupancy of privatized housing" by service members, and that "the Government does not guarantee occupancy of the units." Aurora III Lease ¶ 19.4. Despite this clear and repeated language disclaiming any obligation on the Government to pay tenant rent or even guarantee occupancy, Aurora asks this Court to require the Government to pay tenant rent. This language alone is sufficient for the Court to find that Aurora fails to state a claim for relief as a matter of law, as the Court did in *United Communities, LLC v. United States*, 154 Fed. Cl.

16

676, 681, *reconsideration denied*, 157 Fed. Cl. 19 (2021).[6]

In that case, United Communities also argued that a statutory change in the method to calculate BAH violated a nearly identical 50-year lease agreement governing the maintenance, construction, and renovation of privatized military housing at McGuire AFB-Fort Dix, and thus constituted a breach of contract, breach of the implied duty of good faith and fair dealing, and a taking without just compensation under the Fifth Amendment. 154 Fed. Cl. at 678, 680. In dismissing United Communities' contract claims, the Court quoted many of the same contract provisions that appear in these Lease Agreements and concluded:

> [T]he express terms of the contract documents repeatedly make clear that defendant is not liable to plaintiff for any expected payments plaintiff does not receive. *See, e.g.*, ECF No. 8-1 at 44 (stating that service members are not required to rent from plaintiff, and that defendant 'is not obligated to pay rent for any housing units'); *id.* (stating that plaintiff agreed to operate and maintain the housing 'at its sole cost and expense'); *id.* at 84 (stating that plaintiff agreed to 'operate and maintain the Leased Premises and the Leased Premises Improvements at no expense to [defendant]'); *id.* at 84, 89 (stating that plaintiff 'shall collect rents from Target Tenants,' and that rent 'will not exceed the [BAH] of the military member's grade designated for that unit (less a utility allowance for gas and electricity)'); *id.* at 84 (stating that defendant 'shall in no case be responsible for or pay or reimburse [plaintiff] for costs associated with the operation and maintenance of the Project, or for any tenant defaults').

*Id.* at 681–82.

Despite the decision in *United Communities* and repeated disclaimers of Government responsibility to pay Aurora anything, Aurora attempts to reframe service member allotment of

---

[6] The United States Court of Federal Claims denied United Communities' motion for reconsideration on November 18, 2021. Opinion and Order, *United Communities v. United States*, No. 20-1220C (Fed. Cl. Nov. 18, 2021), ECF No. 21. Accordingly, United Communities had 60 days from that date to file notice of appeal in the United States Court of Appeals for the Federal Circuit. On February 16, 2022, almost a month after the 60-day deadline elapsed, United Communities filed an untimely motion in the Court of Federal Claims seeking a 30-day extension of time to file a notice of appeal. *See id.* at ECF No. 22. That same day, United Communities also filed an untimely notice of appeal in the Federal Circuit. The Court of Federal Claims has stayed briefing on the motion as the matter was transmitted to the Federal Circuit. *Id.* at ECF No. 25.

BAH payments to Aurora as somehow being a payment by the Government. *See, e.g.,* Compl. ¶ 76 ("Contractually, the Aurora Entities are unable to charge military members for housing; instead, the only consideration the Aurora Entities receive under the Contracts is the Government's BAH payments[,] which go directly to the Aurora Entities."). But BAH is an entitlement that belongs to the service members—a fact that Aurora acknowledges in other portions of its complaint. *See* Compl. ¶ 18 ("The BAH is a housing benefit provided to U.S.-based military members who do not live in the barracks, including those who decide to live off base or in privatized military housing.").

By entering into a lease with Aurora, service members are required to allot their BAH payments to Aurora. Aurora I Military Resident Lease ¶ 4; Aurora II Military Resident Lease ¶ 4; Aurora III Military Resident Lease ¶ 4.1. This is consistent with the provisions above that the Government is not liable for rent payments; and that Aurora "shall collect from tenants all rents, damage deposits, and other fees that are permissible under the Lease." Aurora I Operating Agreement ¶ 2(b); Aurora II Operating Agreement ¶ 2(b). Thus, Aurora's suggestion that the Government is responsible for rental payments is a legal conclusion that must be rejected. *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

Next, Aurora's admission that it cannot charge service members a monthly housing rent more than service members' BAH, Compl. ¶¶ 25, 39, 51, 53, is also an independently sufficient basis for the Court to find that Aurora fails to state a claim for relief. In essence, under the guise of changes to 37 U.S.C. § 403, Aurora wants to be paid tenant rents at a higher rate than service members actually receive in BAH despite its admission and despite the Lease Agreements' plain language. The Lease Agreements and the incorporated Operating Agreement again make multiple references to Target or Referral Rent, which inextricably links the monthly housing rent

to each service members' monthly BAH (at the with dependents rate), less the pre-determined utility charge. Aurora I Amended Lease ¶ 19.5 (defining Referral Rent in relation to BAH); Aurora II Amended Lease ¶ 19.5 (same); Aurora III Lease ¶ 34.2 (defining Target Rent in relation to BAH); *see also* Aurora I Rental Rate Management Plan at 1 (capping rental rates "at the applicable BAH for the tenant's grade minus a utility allowance" and providing for the update of a tenant's rental agreement and lease based upon "each BAH change"); Aurora II Operating Agreement at 3 (stating that "rental rates correspond to applicable unrestricted BAH 'with dependent' rates of active duty military minus utilities"); Aurora III Military Lease ¶ 4.1 (obligating the tenant "to pay as monthly rent an amount equal to the ranking military member's [BAH] at the with dependents rate").

Numerous other provisions reinforce this requirement that tenant rent is tied to each service member's pay grade, and that rates will vary annually or based on other circumstances. For example, BAH updates will be made annually "with cost of living adjustments and as resident ranks change." Aurora I Operating Agreement at 9; Aurora II Operating Agreement at 3 (same); *see also* Aurora III Rental Rate Management Plan at 3 ("Rental rates for Target Tenants will automatically change as annual BAH rates change and as the military member's rank and BAH entitlements change). Service members may also elect to "rent-up" by choosing a unit designated for a higher pay grade, but they are required to sign a statement acknowledging that that they will pay an amount out-of-pocket, *i.e.* above their current pay grade and BAH, for that purpose. *See* e.g., Aurora III Rental Rate Management Plan at 4.

Further, Aurora's reference to a "reduction" in its alleged entitlement under the Lease Agreements is a misnomer. *See, e.g.*, Compl. ¶ 100. Although a percentage-based reduction applies in the calculation of BAH, generally, rates have continued to rise annually:

19

> Beginning in 2015, DOD began reducing the basic allowance for
> housing payments relative to the Defense Travel Management
> Office's calculations of market rate rents and utilities. According
> to Defense Travel Management Office officials, basic allowance
> for housing payments are not necessarily decreasing from year to
> year. Instead, the average basic allowance for housing payment
> across the geographic areas has risen due to increases in market
> rate calculations, even as basic allowance for housing payments
> have been reduced relative to these calculations.

GAO Report 18-218, Military Housing Privatization, DOD Should Take Steps to Improve

Monitoring, Reporting, and Risk Assessment, at 2 n.3 (March 2018), *available at*

https://www.gao.gov/assets/700/690621.pdf.   Indeed, this is confirmed in reviewing publicly

available data for JBER; since the parties executed the first lease agreement in 2001, the monthly

BAH with dependents rates have fluctuated up and down from year to year, and generally have

increased over time as shown by these pay grade examples[7]:

| Year | E-1 to E-4 | E-7 | O-4 |
|------|-----------|-------|-------|
| 2001 | $980 | $1,277 | $1,530 |
| 2002 | $980 | $1,395 | $1,568 |
| 2003 | $980 | $1,433 | $1,790 |
| 2004 | $1,107 | $1,560 | $1,923 |
| 2005 | $1,136 | $1,624 | $1,982 |
| 2006 | $1,256 | $1756 | $2079 |
| 2007 | $1,525 | $1,758 | $2,115 |
| 2008 | $1,433 | $1,804 | $2,161 |
| 2009 | $1,565 | $2,029 | $2,394 |
| 2010 | $1,479 | $1,989 | $2,664 |
| 2011 | $1,503 | $2,055 | $2,652 |
| 2012 | $1,578 | $2,139 | $2,670 |
| 2013 | $1,698 | $2,238 | $2,808 |
| 2014 | $1,542 | $2,274 | $2,835 |
| 2015 | $1,734 | $2,226 | $2,697 |
| 2016 | $1,707 | $2,310 | $2,856 |
| 2017 | $1,686 | $2,352 | $2,688 |

---

[7] The Defense Travel Management Office maintains BAH rate data across all localities and pay grades, dating back to 1995. *See* https://www.defensetravel.dod.mil/site/pdcFiles.cfm?dir=/Allowances/BAH/PDF/. Data is searchable under the "BAH" folder by year and for either "with" or "without" dependents rates. BAH rates for service members stationed at JBER can be found under MHA code "AK404" and MHA location "Anchorage, AK."

| Year | E-1 to E-4 | E-7 | O-4 |
|------|------------|-----|-----|
| 2018 | $1,611 | $2,238 | $2,661 |
| 2019 | $1,626 | $2,193 | $2,682 |
| 2020 | $1,611 | $2,190 | $2,700 |
| 2021 | $1,707 | $2,253 | $2,724 |

Aurora cannot have a claim simply because the BAH rates, and therefore its rental income, are not as high as it would like.

Based on the foregoing, the Lease Agreements clearly state that the Government is not responsible for paying tenant rent to Aurora, and that Aurora cannot charge tenant rent that exceeds each service member's BAH, which is subject to change. *See, e.g.*, Aurora III Rental Rate Management Plan at 3 ("Rental rates for Target Tenants will automatically change as annual BAH rates change and as the military member's rank and BAH entitlements change). Consequently, because Aurora cannot establish the existence of a contractual duty or obligation for payment, its claims fail as a matter of law.

> **B.    Aurora Improperly Attempts To Read-In A New Lease Term Regarding The Method To Calculate BAH That Was Never Incorporated Into The Lease Agreement**

Aurora asserts that, at the time it contracted with the Government, the BAH "was statutorily defined to fully cover the cost of military family housing," Compl. ¶ 12, thereby entitling Aurora to receive BAH payments equal to the full fair market price of equivalent housing rentals near JBER for a 50-year period, *id*. ¶¶ 82, 84. In doing so, Aurora attempts to read into the Lease Agreements a method of calculating BAH that was never incorporated in the agreements.

As discussed above, prior to 2015, the BAH statute generally required the Secretary of Defense to determine the costs of adequate housing in a military housing area for all members of the uniformed services based on "the costs of adequate housing for civilians with comparable

income levels in the same area" and historical data regarding the national average monthly housing costs for the two preceding years. *See* 37 U.S.C § 403 (2000-2014). However, nothing in the Lease Agreements incorporate this method of calculating BAH. To this point, Aurora fails to cite any provisions in the Lease Agreements that explicitly define BAH as "the full fair market value of equivalent housing in the Anchorage area." Compl. ¶ 75. Instead, Aurora asks this Court to conclude that it is entitled to BAH payments based on the full fair market value of comparable housing merely because:

> [T]he Government noted that rental rates for service members would be set at the BAH, which was defined as "[t]he sum allotted to each service member to *cover* the cost of housing, including utilities and personal property insurance. The respective amount corresponds with the service member's rank and dependent status. Refer to Internet Web site http://www.military.com/Resources/ResourcesContent/0,13964,30825,00.html for additional information." (Emphasis added)

Compl. ¶ 53 (citing Aurora I Amended Lease ¶ 19.5; Aurora II Amended Lease ¶ 19.5). Aurora appears to argue that "cover," emphasized above, is synonymous with "the full fair market value of equivalent housing in the Anchorage area," which, in turn, references the pre-2015 BAH calculation. This leap in logic is neither supported by the Lease Agreements nor precedent governing contract interpretation.

As previously discussed, the Aurora I and Aurora II Amended Leases define BAH as "[t]he sum allotted to each service member to cover the cost of housing, including utilities and personal property insurance." Aurora I Amended Lease ¶ 19.5; Aurora II Amended Lease ¶ 19.5. Similarly, the Aurora III Lease defines BAH as "the entitlement of [active duty] member[s] for the cost of housing, including utilities and personal property insurance, pursuant to 37 U.S.C. Chapter 7, Section 403." Aurora III Lease ¶ 34.2. Conspicuously absent from the BAH definitions is any mention of "full fair market value," which Aurora claims it is entitled to.

22

The Lease Agreements' BAH definitions neither identify how BAH will be calculated nor incorporates any BAH calculation into the agreements. To be clear, the Aurora I and Aurora II Amended Leases do not reference the pre-2015 BAH statute, which provided a method by which BAH was determined. And although the Aurora III Lease makes one reference to the pre-2015 BAH statute, the lease does not expressly incorporate the pre-2015 method for calculating BAH. *See* Aurora III Lease ¶ 34.2 (referencing 37 U.S.C. § 403). This passing reference to § 403 cannot be reasonably viewed as explicitly incorporating the pre-2015 BAH calculation.

Considering general principles of contract interpretation, the Federal Circuit "has been reluctant to find that statutory or regulatory provisions are incorporated into a contract with the government unless the contract explicitly provides for their incorporation." *St. Christopher Assocs., L.P. v. United States*, 511 F.3d 1376, 1384 (Fed. Cir. 2008) (citing *Smithson v. United States,* 847 F.2d 791, 794 (Fed. Cir. 1988). For example, *Smithson* warned that "wholesale incorporation of regulations into a contract would allow the contracting party to choose among a multitude of regulations as to which he could claim a contract breach—and thus [a] wholly new ground of obligation would be summarily created by mere implication." *Id.* (internal quotations omitted). Indeed, "[i]n suing for a breach of contract plaintiff must rely on the express terms of the contract and cannot, as it has attempted to do here, import into the agreement terms outside of those expressly contained in the agreement." *Texas v. United States*, 537 F.2d 466, 471 (Ct. Cl. 1976); *see also Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 826 (Fed. Cir. 2010) ("In the absence of explicit contract language incorporating the [Endangered Species Act (ESA)], we decline to create a whole new set of obligations—compliance with the multitude of substantive and procedural requirements comprising the ESA—by mere implication." (citing *St. Christopher*, 511 F.3d at 1384)). Incorporation by reference is a question of law. *Northrop*

23

*Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1343 (Fed. Cir. 2008) (citations

omitted). Although no "magic words" are required,

> [T]he language used in a contract to incorporate extrinsic material
> by reference must explicitly, or at least precisely, identify the
> written material being incorporated and must clearly communicate
> that the purpose of the reference is to incorporate the referenced
> material into the contract (rather than merely to acknowledge that
> the referenced material is relevant to the contract, e.g., as
> background law or negotiating history).

*Id.* at 1345–46.

At best, the reference to 37 U.S.C. § 403 is only provided for background information,

making no mention of how BAH is calculated under the statute, and informs the parties that DoD

would unilaterally set the values annually. In the absence of contract provisions incorporating

full fair market value as the method by which BAH is calculated, Aurora cannot ask this Court to

read such a provision into the Lease Agreements. And because Aurora cannot show such a

requirement was made part of the Lease Agreements, this provides the Court with yet another

reason to dismiss the complaint. United Communities' breach of contract claim failed for this

reason, and so too must Aurora's claim. *United Communities*, 154 Fed. Cl. at 683 (holding that

"because plaintiff has not sufficiently alleged a duty on the part of defendant with regard to the

method required for calculating BAH, its breach of contract claim must be dismissed").

In contrast, the requirement that Aurora not charge more in tenant rent than each service

member receives in BAH is repeated throughout the Lease Agreements, and there is no dispute

that Aurora is obligated to comply with it. Allowing Aurora to equate a BAH calculation to

"full fair market value" of comparable rentals in the area, *see* Compl. ¶ 75, would not comport

with this agreed-upon requirement, and does not harmonize and afford reasonable meaning to the

Lease Agreements' numerous requirements for Referral or Target Rent. *See NVT Techs*, 370

F.3d at 1159 ("[T]he document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts.").

In sum, Aurora got exactly what it bargained for under the terms of the Lease Agreements. In exchange for obtaining a 50-year lease of Government property virtually for free, and the ownership of the Government's existing inventory of military family housing, Aurora also agreed to build, renovate, operate, and manage rental housing for service members, subject to the Lease Agreements' many detailed terms, and at its sole cost and expense. Aurora may not be happy with its rental income from service member BAH—despite also now receiving congressionally mandated NDAA payments to offset a percentage of the BAH reductions—but the Lease Agreements do not support its claims for relief in this case as a matter of law. The Court should dismiss the complaint.

III.  **Aurora Cannot Establish A Breach Of The Implied Duty Of Good Faith And Fair Dealing By Expanding Non-Existent Duties**

Although every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement, that duty depends in part on what a contract promises or disclaims. *See Metcalf Const. Co. v. United States*, 742 F.3d 984, 990–91 (Fed. Cir. 2014) (citing *Precision Pine*, 596 F.3d at 830). "The covenant of good faith and fair dealing . . . imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Id.* at 991 (quoting *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)). However, the "implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions." *Id.* (citing *Precision Pine*, 596 F.3d at 831). *See also Bell/Heery*, 739 F.3d at 1335 (The "implied duties of good faith and fair dealing cannot

form the basis for wholly new contract terms") (internal citation omitted).

 As demonstrated above, Aurora cannot establish any contractual duty or obligation of the Government to pay any tenant rent to Aurora, and tenant rent is capped at each service member's BAH, not the higher rates that Aurora advances here. *See, e.g.*, Aurora I Amended Lease ¶ 19.5; Aurora II Amended Lease ¶ 19.5 (defining Referral Rent as equal to service members' BAH); *see also* Compl. ¶ 51 (acknowledging that Aurora is prohibited from asking service members "to pay more than the BAH in rent"). And without contract terms supporting the Government's obligation to pay tenant rent or higher tenant rent equal to the fair market value of adequate housing in a particular area, Aurora cannot create duties inconsistent with the Lease Agreements or create wholly new contract terms. *See United Communities*, 154 Fed. Cl. at 683 (concluding that plaintiff's claim for breach of the implied duty of good faith and fair dealing fails as it would impermissibly "'expand [defendant's] contractual duties beyond those in the express contract'") (quoting *Precision Pine*, 596 F.3d at 831).

 Aurora's claims are based on the same allegations that the Government breached its obligation by "unilaterally reducing the BAH, thus reducing the amount that the Aurora Entities received as rent for its housing units." Compl. ¶ 99. Because the contract does not create such an obligation, count two fails and must be dismissed.

IV. **Aurora Cannot Establish A Fifth Amendment Taking Because It Agreed To All The Requirements In The Lease Agreement That Form The Basis Of Its Claim**

 Finally, Aurora raises a third count, alleging a taking under the Fifth Amendment, Compl. ¶¶ 102–108. The Fifth Amendment of the U.S. Constitution provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. A takings claim is evaluated under a two-part analysis. "First, the court determines whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the

subject of the taking. Second, if the court concludes that a cognizable property interest exists, it determines whether that property interest was 'taken.'" *Acceptance Insurance Cos., Inc. v. United States*, 583 F.3d 849, 854 (Fed. Cir. 2009) (citations omitted).

In some instances, a property interest in contract rights can be the basis of a cognizable property interest under the Fifth Amendment. *Cienega Gardens v. United States*, 331 F.3d 1319, 1329 (Fed. Cir. 2003) (citing *Lynch v. United States*, 292 U.S. 571, 579 (1934) ("The Fifth Amendment commands that property be not taken without making just compensation. Valid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States.")).

However, "to effect a taking of a contractual right when performance has been prevented, the government must substantially take away the right to damages in the event of a breach." *Piszel v. United States*, 833 F.3d 1366, 1377 (Fed. Cir. 2016). Otherwise, "when the government itself breaches a contract, a party must seek compensation from the government in contract rather than under a takings claim." *Id.* at 1376; *see also A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1156 (Fed. Cir. 2014) (explaining that takings liability is redundant when the Government is subject to contractual remedies); *St. Christopher*, 511 F.3d at 1385 ("In general, takings claims do not arise under a government contract because . . . the government is acting in its proprietary rather than its sovereign capacity, and because remedies are provided by the contract."); *Allegre Villa v. United States*, 60 Fed. Cl. 11, 18 (2004) (citing *Sun Oil Co. v. United States*, 572 F.2d 786, 818 (1978) (holding that "the concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract")).

Here, the crux of Aurora's taking claim is as follows:

27

> Under the Contracts, the Aurora Entities own and operate 3,262 units of military family housing at JBER, the largest military base in Alaska. Under the Contracts, the Aurora Entities are entitled to receive payments from the Government for rental charges to military service personnel occupying these housing units based on the full fair market value of adequate housing in the area, as represented by the BAH.

Compl. ¶¶ 105–106. Although Aurora asserts that the Government is depriving Aurora of its property rights "by reducing the BAH below the full fair market cost of adequate housing in the area," *id*. ¶ 107, Aurora's taking claim stems from its contractual obligations under the Lease Agreements. Thus, Aurora can offer no basis for its taking claim regarding its lease interests that are not already constrained by the same terms of those leases. *See Century Expl. New Orleans, Inc. v. United States*, 110 Fed. Cl. 148, 182 n.32 (2013), *aff'd*, 745 F.3d 1168 (Fed. Cir. 2014) (dismissing plaintiff's breach of contract claim and again noting disposition of that claim was "critically important" to the court's consideration of the taking claim). As such, the plaintiffs' taking claim in count three, like the other counts of the complaint, must be dismissed.

<u>CONCLUSION</u>

For these reasons, we respectfully request that the Court dismiss Aurora's complaint for failure to state a claim upon which relief can be granted.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Elizabeth M. Hosford
ELIZABETH M. HOSFORD
Assistant Director

OF COUNSEL:

/s/ Ebonie I. Branch
EBONIE I. BRANCH

ALISSA SCHRIDER

28

Trial Attorney                        Trial Attorney
Air Force Legal Operations Agency     U.S. Department of Justice
1500 W. Perimeter Rd.                 Civil Division
Joint Base Andrews, MD 20762          Commercial Litigation Branch
                                      P.O. Box 480
                                      Ben Franklin Station
                                      Washington, DC 20044
                                      Telephone: (202) 353-7578
                                      Facsimile: (202) 305-7644

February 25, 2022                     Attorneys for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that, on 25th day of February 2022, a copy of the foregoing

"DEFENDANT'S MOTION TO DISMISS" was filed electronically.   I understand that notice of

this filing  will be sent to all parties by operation  of the Court's electronic filing  system. Parties

may access this filing  through  the Court's system.


/s/ Ebonie  I. Branch
EBONIE I. BRANCH

30